WADE, ADMX., APPELLEE, *v.* SCHNEIDER, APPELLANT.

(Decided June 19, 1939.)

*Messrs. Murray & Murray,* for appellee.
*Messrs. King, Flynn & Frohman,* for appellant.

OVERMYER, J. Appellee, as administratrix of the estate of her husband, Glenn Wade, deceased, brought an action in Common Pleas Court for damages against appellant because of pain and anguish suffered by decedent during seven days before his death, and funeral and hospital bills incurred, following a collision between a motorcycle on which decedent was riding with another man, and the automobile of appellant. The collision occurred at an intersection of two county roads in this county on August 6, 1937.

On trial the appellee recovered a verdict in the

sum of $2,500, signed by ten jurors, and judgment was later entered on the verdict. This appeal seeks a reversal of the judgment and the errors assigned, eleven in number, relate to the failure of the trial court to sustain motions duly made for a directed verdict in favor of appellant, and a number of errors of trial. However, the only error urged in this court is the failure to direct a verdict for appellant.

The pertinent facts may be briefly stated as follows:

On the morning of the collision the decedent and one Steve Fortuna, both employed at the Wagner quarries near Sandusky, Ohio, proceeded from their homes at Castalia on a motorcycle to work, as had been their custom over this same route for about three years. The motorcycle belonged to Fortuna and he was driving it, decedent sitting on the regular seat behind Fortuna, and Fortuna sitting on an improvised board seat they had fastened immediately in front of the regular seat. They were proceeding east on what is known as Section Line road, approaching the intersection of that road with Bardshar road, or formerly route 99, at a time when it was daylight on a clear morning. At the same time, appellant was coming in his automobile north on the Bardshar road toward the intersection. Appellant was therefore on the right of Fortuna and Wade, and in that respect he had the right of way so long as he proceeded in a lawful manner. There was a cornfield at the corner between the approaching parties, also some brush and trees.

When appellant had entered the intersection, the motorcycle, coming from his left, attempted to pass through the intersection by swerving to its left, one eyewitness says six feet off the center of the road, and going around in front of the appellant's automobile. Fortuna admits turning the motorcycle to his left, and all the physical facts undisputedly show that the motorcycle had to turn to its left side of the road to get around the front of appellant's automobile. In

making this movement, the motorcycle came in contact with the front bumper and the right headlight of appellant's car, following which appellant's car went substantially straight ahead, and stopped within 42 feet of the center of the intersection, and the motorcycle went forward in the direction in which it had been traveling, apparently out of control, for some 40 feet, plunged into a ditch, throwing both riders off, one of them 40 feet beyond where the motorcycle landed, injuring Wade so that he died·seven days later, and injuring Fortuna also.

Appellant says he looked to his left when some 1200 feet from the intersection but could see little because of the cornfield and did not see the motorcycle; that he approached the crossing at about 15 miles per hour and when about 20 or 25 feet from the center of the intersection he first saw the motorcycle about 100 to 125 feet away, and that it then swerved "the wrong way" and he saw it was going to try to cross in front of him and that he then put on his brakes and by this time was beyond the center of the intersection and the motorcycle was attempting to and did pass around in front of him. He states that if the motorcycle had remained on its south side of the road there would have been ample room to pass to the rear of his automobile, as he had already cleared that part of the road.

There appears in the record the testimony of several eyewitnesses in addition to Fortuna and appellant. One of these is a man who was sitting by the side of the Bardshar road at the intersection waiting for another party to pick him up; another was in a house by the intersection looking out the window toward the intersection. No witness places the appellant's automobile speed at any time in excess of 30 to 35 miles per hour, and he says it was 15 miles per hour when entering the intersection. The eyewitnesses place the speed of the motorcycle at about the same, from 30 to 40, Fortuna placing it at 30 to 35, and ap-

pellant placing it, when he saw it coming after he was in the intersection, at 40 to 50. Fortuna testified that decedent said nothing about the speed they were traveling, or the intersection, or any approaching car as they approached the intersection. As to the probable cause of this collision, the following testimony of Fortuna is significant:

"Q. Now just as you approached the intersection of the Section Line road and Bardshar road, tell the court and jury, did you look to the left, to your right and to your left, before entering the intersection? A. Yes, sir.

"Q. And did you see any cars coming from your right when you looked? A. No, sir.

"Q. Now, will you tell the court and jury, you proceeded through the intersection then? A. Yes, kept right on going. I didn't see nothing.

"Q. The instant he was about to hit you, you were right in front of him [appellant] when you first saw him? A. Yes.

"Q. At that time, when you first saw him and he was about to hit you, could you tell in feet how far he was from you? A. No, it was too close, I couldn't tell you.

"Q. So that when you first saw him you were past the center line of the Bardshar road? A. Yes, sir.

"Q. And just where were you with reference to the Bardshar road when you first looked to the right? A. Gosh, I don't know, twenty feet, twenty-five feet—I don't know.

"Q. Do you mean from the center of the Bardshar road? A. From the center of the road.

"Q. And at the point that you looked, twenty or twenty-five feet back, how far down the Bardshar road could you see? A. Kind of angling, you could see down there a hundred feet, I judge.

"Q. And when you looked to the right, at that time, you were traveling how fast? A. Between 30 and 35 miles an hour.

"Q. And in the hundred feet you could see down

the Bardshar road, you didn't see the Schneider car? A. No, sir, I didn't see nothing."

See *D. T. & I. Rd. Co.* v. *Rohrs*, 114 Ohio St., 493, 151 N. E., 714.

The charges of negligence lodged against appellant by the petition were: Failure to allow the motorcycle to continue through the intersection; failure to bring the automobile to, a stop so as to avoid striking the motorcycle; striking the motorcycle after it was two-thirds through the intersection; so operating the automobile as not to be able to stop within the assured clear distance ahead; failure to apply brakes and stop the car after he saw the motorcycle; failure to leave the right side of the road and swing over to his left side (wrong side) of the road to avoid striking the motorcycle; failure to keep a proper lookout or make any observation whatever to ascertain the presence of the motorcycle.

We have read the entire record in the light of these charges of negligence and we do not find any evidence to sustain a verdict as to any one of them. There is no evidence that appellant was violating any statutory law or rule of the road, or that he failed to exercise ordinary care on the occasion in question. He had the right of way so long as he proceeded in a lawful manner, and we are unable to find in what respect he had forfeited that right as to speed, position in the highway, looking, handling of his automobile after he became aware that the other party was not yielding the right of way, or in any other respect that would cast on him the liability for the collision.

One of the claims of negligence, upon which the jury was charged, relates to the "assured clear distance ahead" statute. In this connection, we call attention to a decision of the Supreme Court, *Blackford* v. *Kaplan*, 135 Ohio St., 268, 20 N. E. (2d), 522, where the court say:

"The doctrine of assured clear distance has no ap-

plication to drivers of automobiles approaching an intersection on different intersecting roads under ordinary circumstances. Surely it did not apply to the defendant with reference to the automobile driven by Hanna [in our case, Schneider], for the defendant had the right of way so long as he proceeded in a lawful manner * * *."

We would be required to say the assured clear distance doctrine would not apply in the present case for there are no circumstances shown that could be classed as extraordinary to exclude the case from the force of the foregoing Supreme Court decision. See also, on this subject: *Slocumb* v. *Wurst* (Second Appellate District), 25 Ohio Law Abs., 477; *Proctor* v. *White* (Second Appellate District), 22 Ohio Law Abs., 115; *Duffy* v. *Bonnell* (Seventh Appellate District), 28 Ohio Law Abs., 88; *Souder* v. *Hassenfeldt, Admx.*, 48 Ohio App., 377, 383, 194 N. E., 47.

We find that the court erred in not sustaining the motion of defendant, seasonably made, to direct a verdict for defendant, and the judgment is reversed and final judgment entered for appellant.

*Reversed and final judgment for appellant.*

CARPENTER and LLOYD, JJ., concur.